**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JULIE A. OSBORN,** | **§** | |
| **PLAINTIFF,** | **§** | |
| | **§** | |
| **VS.** | **§** | **CIVIL ACTION NO. 4:06-CV-080-A** |
| | **§** | |
| **MICHAEL J. ASTRUE,** | **§** | |
| **COMMISSIONER OF SOCIAL SECURITY,** | **§** | |
| **DEFENDANT.** | **§** | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A. STATEMENT OF THE CASE

Plaintiff Julie A. Osborn brings this action pursuant to Section 405(g) of the Social Security Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act. Osborn applied for disability benefits on March 24, 2003, with an alleged disability onset date of September 1, 2002. (Tr. 67). She met the insured status requirements at all times relevant to the administrative decision.

The Social Security Administration denied Osborn's application for benefits both initially

and on reconsideration. Osborn requested a hearing before an administrative law judge (the "ALJ"), and ALJ James A. Wendland held a hearing on May 27, 2004 in Fort Worth, Texas. (Tr. 259-96). Osborn was represented by counsel. On July 30, 2004, the ALJ issued a decision that Osborn was not disabled because she had the residual functional capacity (RFC) to perform a modified range of sedentary work.[1] (Tr.11-19). The Appeals Council denied Osborn's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 3).

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.

---

[1] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. § 404.1567(a).

*Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the

Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C. ISSUES

1. Whether the Commissioner complied with the applicable regulations and rulings in assessing Osborn's residual functional capacity, and whether that assessment is supported by substantial evidence.

2. Whether the determination that Osborn could perform other work existing in significant numbers in the national economy is supported by substantial evidence.

D. ADMINISTRATIVE RECORD

1. Medical History

The administrative transcript provides the following information about Osborn's medical condition and treatment history: Osborn was seen by rheumatologist Iman Ali, M.D., in 2002. (Tr. 161-63). She complained of joint pain, back pain, and increasing fatigue. Ali diagnosed Osborn with fibromyalgia[2] after finding fourteen tender points on physical examination. (Tr. 162). He referred her for physical therapy and rehabilitation services. (Tr. 141-53). X-rays of both knees were taken on November 8, 2002 and showed mild changes, while x-rays of both hands were normal. (Tr. 125). An x-ray of her cervical spine showed moderate degenerative changes at C5-C6 and bilateral facet arthropathy[3] in the upper- to mid-cervical spine. (Tr. 126).

Neurologist Kevin Connor, M.D., has treated Osborn for a seizure disorder. (Tr. 168-74).

---

[2] Fibromyalgia is a group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures. MERCK MANUAL OF DIAGNOSIS AND THERAPY 481-82 (17th ed. 1999).

[3] Arthropathy refers to any joint disease. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 152 (29th ed. 2000).

On February 25, 2002, Osborn reported two breakthrough spells that occurred during periods when she was sleep-deprived. She was taking her medication as prescribed, but was suffering insomnia as a result of bladder difficulties. (Tr. 171). During a check-up on July 29, 2002, Osborn reported no spells since her last visit, but she had developed a hand tremor. (Tr. 170). Conner noted that some of the medications Osborn used could be expected to increase hand tremors. He assessed her seizure disorder as currently controlled, but noted that Osborn had reduced her seizure medication without seeking a physician's advice. (Tr. 170). At a follow-up visit with Conner in January 2003, Osborn reported two recent spells. She was not taking her medication as directed. (Tr. 168). She also reported being sleep deprived because of the holidays. Conner assessed complex partial seizures, and opined that he wanted Osborn to take her medication as recommended, but had been unable to accomplish this for several years. (Tr. 168).

Osborn also suffers from interstitial cystitis.[4] A February 2002 intravenous pyelogram[5] (IVP) ordered by physician Patrick Collini, M.D., was normal, as was a computed tomography (CT) scan. (Tr. 121, 193). Collini referred Osborn to urologist Marie-Blanche Tchetgen, M.D., for evaluation of her complaints of urinary urgency, pelvic pain, and bladder pain. (Tr. 191). Tchetgen prescribed medication, and scheduled a follow-up visit in three months. (Tr. 121).

By August 2002, Osborn was reporting significant improvement on her current treatment regimen, but her symptoms returned after she tapered off her medications due to their side-effects.

---

[4] Interstitial cystitis is a bladder condition occurring predominately in women, with an inflammatory lesion that is notoriously difficult to detect, and typically involves urinary frequency and pain. *Id*. at 450. *See also* SOCIAL SECURITY RULING 02-2p.

[5] Pyelography refers to a radiographic study of the kidney and ureter after the structures have been filled with a contrast solution. *Id*. at 1498.

(Tr. 187-88). At a follow-up visit with Tchetgen on March 12, 2003, Osborn complained of the increasing severity of her symptoms, with urinary frequency and increasing fatigue. (Tr. 185). In July 2003, after conservative treatment measures failed, Osborn underwent surgery to place an implantable pulse generator (IPG) for management of her interstitial cystitis. (Tr. 178, 221).

Osborn reported doing well when she saw Tchetgen in October, but she still described good days and bad days. (Tr. 215). The IPG was readjusted in November 2003 to address Osborn's reports of pelvic pressure, pain, urgency, and frequency. (Tr. 213). On January 12, 2004, Osborn described her problems as mild and was reportedly doing well with no recent urinary tract infections. (Tr. 211). The IPG was in correct position and the site was not tender. (Tr. 211). Osborn's IPG was still functional during a follow-up visit on March 5, 2004. She reported that her interstitial cystitis was somewhat improved, and she had experienced remarkable improvement within the last two days, which she attributed to her new anti-seizure medication. (Tr. 209).

Tchetgen completed a written assessment of Osborn's functioning on April 22, 2004. Tchetgen opined that Osborn experienced pain that would distract her from the adequate performance of daily activities or work. (Tr. 247-48). Tchetgen also opined that Osborn could sit for a maximum continuous period of fifteen minutes, for a cumulative time of two hours per eight-hour workday, and stand for up to thirty minutes at a time for a total of two hours per eight-hour workday. Tchetgen stated that Osborn, in addition to lunch and regular work breaks, would need to rest for up to four hours during the workday depending on her pain level on any given day. (Tr. 249-51). Tchetgen opined that Osborn could lift up to five pounds frequently and up to twenty pounds occasionally. Tchetgen found no restriction in Osborn's ability to use her hands on a

repetitive basis, but opined that Osborn should be restricted to only occasional stooping. (Tr. 252).

2. Administrative Hearing

Osborn testified that she had been employed as a salesman in the printing industry, but eventually stopped working because of her health. Osborn testified that she was on two seizure medications and her most recent seizure had occurred two weeks before the hearing. (Tr. 264). She was exhausted after having a seizure and had no memory of the event. She had noticed that she was more susceptible to seizures when she was tired, but she was frequently tired because pain and other symptoms of her interstitial cystitis prevented her from sleeping well. (Tr. 267).

In addition to her seizures, Osborn suffered from back pain. She used Tylenol for the pain because her physicians had been unable to find another medication that worked well for her. (Tr. 266). Her fibromyalgia also caused low back pain and hip pain, but the most intense pain was the abdominal pain caused by her bladder problems. (Tr. 269). She limited her lifting because of the pain. Osborn testified that the surgery to implant the IPG had provided temporary relief, but now her symptoms were as bad as ever if not worse. (Tr. 270).

Osborn testified that she did not drive because of her seizure disorder. Her adult daughter had moved in with her and did the grocery shopping, housecleaning, and laundry. (Tr. 276). Osborn had recently moved to a one-story home because she was unable to climb the stairs in her old house. (Tr. 276). Osborn also described problems with concentration, which she attributed to pain and the medications she was taking. (Tr. 279).

Vocational expert Carol Bennett testified that Osborn's previous job as a printing sales representative was considered skilled work requiring light exertion. (Tr. 286). The ALJ asked

Bennett to consider a person of Osborn's age and education who was limited to sedentary work, but not required to stoop, crouch, crawl, kneel, or climb stairs or ramps more than occasionally; not required to climb scaffolds, ladders, and ropes, or balance; not required to sit without the opportunity to stand occasionally; and not required to work at unguarded heights or near unguarded hazardous equipment. (Tr. 286-87, 289). Bennett testified that a person with these limitations could perform unskilled work as an assembler (with 4,400 jobs in Texas and 80,000 jobs nationwide) or production inspector (with at least 1,500 jobs in Texas and 25,000 jobs nationwide). (Tr. 290). She noted that a need for frequent bathroom breaks would have less impact on sedentary jobs than other jobs. (Tr. 292). Bennett conceded that pain or medication side-effects that rose to a level that distracted a worker from performing her work could result in an inability to sustain employment. (Tr. 293).

3. ALJ Decision

The ALJ found that Osborn had not engaged in substantial gainful activity since her alleged onset date, and further found that her fibromyalgia, interstitial cystitis, and seizures constituted severe impairments; however, he found that these impairments did not meet or medically any listed impairment. (Tr. 18). In considering Osborn's residual functional capacity, the ALJ limited her to sedentary work that did not require her to stoop, crouch, crawl, kneel, or climb stairs and ramps more than occasionally; did not require her to balance or climb scaffolds, ladders and ropes; did not require her to sit without an opportunity to occasionally stand; and did not require her to work at unguarded heights or near unguarded hazardous mechanical equipment. (Tr. 18). Based on the vocational expert testimony, the ALJ found a significant number of jobs available for Osborn in the national economy, and therefore, the ALJ concluded that Osborn was not disabled or entitled to

disability insurance benefits. (Tr. 18-19).

E. DISCUSSION

1. Residual Functional Capacity

Osborn contends that substantial evidence does not support the residual functional capacity (RFC) assessment, and further asserts that the Commissioner failed to follow his own rules in making that assessment. More specifically, Osborn contends that the ALJ did not address all of the functional limitations noted by her treating physician or explain his decision that Osborn could perform a modified range of sedentary work.

RFC is what an individual can still do despite her limitations. SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id*.; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered. *Id*. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but presumptions, speculation, and supposition do not constitute evidence. SOCIAL SECURITY RULING 86-8.

Tchetgen provided a medical opinion about Osborn's impairments and her functional abilities that, if adopted, would establish an inability to work on a regular and continuing basis. Opinions, diagnoses, and medical evidence from a treating physician who is familiar with the claimant's impairments, treatment, and response should be given great weight in determining

disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The Commissioner assigns controlling weight to the opinion of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected. In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight. SOCIAL SECURITY RULING 96-2p. However, the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *See* 20 C.F.R. § 404.1527(e); *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237.

Osborn contends that the ALJ failed to consider the relevant factors outlined in the regulations before rejecting Tchetgen's opinion and did not identify good reason for disagreeing with Tchetgen's assessment. 20 C.F.R. § 404.1527(d)(2). Before rejecting a treating source opinion, the ALJ must consider the factors outlined in the administrative regulations, which include: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-5p, 96-2p.

The ALJ reviewed Tchetgen's opinions about Osborn's pain and functional abilities and agreed with Tchetgen's opinion that Osborn could perform sedentary work with occasional stooping and the opportunity to alternate between sitting and standing; however, he disagreed with Tchetgen's determination that Osborn would need to rest for four hours during the workday to relieve the pain caused by her impairment.[6] (Tr. 15). In particular, he found such a limitation was unsupported by the record and contradicted by Osborn's post-surgical records.[7] (Tr. 15-16). Osborn complains that the ALJ did not specifically address Tchetgen's opinion that Osborn's pain was of a level that would distract her from her work; however, the ALJ implicitly rejected this claim in finding Osborn's pain level did not warrant excessive rest periods. In assessing Osborn's credibility, the ALJ likewise found her subjective complaints exaggerated and noted that a treating source opinion based on the truth of such subjective complaints would not be conclusive evidence of a person's residual functional capacity. (Tr. 16). Although Osborn might prefer more specificity in the administrative decision, the ALJ complied with the relevant administrative regulations and rulings in weighing Tchetgen's treating source opinion.

Osborn also contends that the ALJ did not comply with the administrative rulings that require the adjudicator to engage in a narrative discussion of the evidence and how it supports the RFC

---

[6] In her reply brief, Osborn suggests that the ALJ erred in accepting only parts of Tchegen's opinion and rejecting those that did not fit with his determination; however, she also acknowledges that Ruling 96-5p recognizes that a medical source statement may be comprised of separate medical opinions addressing diverse physical and mental functions and that it may be necessary for the adjudicator to decide whether to adopt or not adopt each opinion individually. SOCIAL SECURITY RULING 96-5p.

[7] Osborn concedes that her symptoms after surgery showed initial improvement, but asserts that her symptoms have returned and there has not been sustained improvement. The ALJ, however, reviewed Osborn's pre- and post-surgical symptoms and progress notes from treating sources that indicate she maintained at least some improvement in her condition after the IPG was implanted.

determination. *See* SOCIAL SECURITY RULING 96-8p. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.* Osborn complains that the ALJ rejected the state agency medical consultant's opinion in favor of a more restrictive RFC, but then failed to explain how he decided that Osborn retained the RFC for a modified range of sedentary work.[8]

In his decision, the ALJ outlined the relevant evidence and the reasons underlying his RFC assessment. The ALJ agreed with Tchetgen's opinion that Osborn could perform the exertional requirements of sedentary work. His restrictions on Osborn's ability to stoop, crouch, crawl, kneel, or climb and his determination that she needed an opportunity to alternate between sitting and standing are also supported by Tchetgen's opinion, the x-rays and other diagnostic studies, and Osborn's own statements about her daily activities and limitations. (Tr. 15-16). The ALJ also restricted Osborn from work in hazardous situations because of her documented seizure history. (Tr. 16). The ALJ sufficiently articulated the basis for his RFC determination.

The administrative record reflects that the ALJ considered the evidence and presented reliable reasons for his decision in a manner that allows for meaningful judicial review. The ALJ provided an adequate narrative discussion throughout the sequential evaluation process, including the assessment of Osborn's RFC, and Osborn has failed to demonstrate a lack of substantial evidence to support the ALJ's assessment of her RFC.

---

[8] The state agency medical physicians found Osborn was capable of performing light work if she took seizure precautions. (Tr. 200-06).

2. Vocational Evidence

Osborn contends that substantial evidence does not support the ALJ's determination at Step Five that she can perform other work available in significant numbers in the national economy. More specifically, she asserts that Tchetgen's opinion establishes that she is unable to perform any of the work identified by the vocational expert on a regular and continuing basis.

Osborn's argument is a restatement of her contention that the ALJ erred in his assessment of her RFC, thus causing the ALJ to present the vocational expert with a flawed hypothetical question. *See generally Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). But as addressed *supra*, no error in the assessment of Osborn's' residual functional capacity or a lack of supporting substantial evidence has been established. During the hearing, the ALJ asked the vocational expert to consider whether there was suitable work available in the national economy for a person of Osborn's age, education, work experience, with the RFC as found by the ALJ. In response, the vocational expert was able to identify several jobs available in significant numbers in the national economy. Osborn has not demonstrated a basis for discrediting this testimony.

The ALJ's determination that there were a significant number of jobs in existence that Osborn could perform is supported by substantial evidence and has not been shown to be a product of legal error. Accordingly, the Commissioner's determination that Osborn was not disabled on or before the expiration of her insured status for purposes of benefits under Title II of the Social Security Act should be affirmed.

## RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until April 11, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until April 11, 2007 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the

filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED MARCH 20, 2007.

/s/ Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE